## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RUSSELL HOPEWELL and CRAIG HOLMAN, Derivatively on Behalf of REVOLUTION LIGHTING TECHNOLOGIES, INC., | Index No: 19-cv-03913 |
| | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Plaintiffs, | |
| vs. | **DEMAND FOR JURY TRIAL** |
| ROBERT V. LAPENTA, JAMES A. DEPALMA, WILLIAM D. INGRAM, STEPHEN G. VIRTUE, and DENNIS MCCARTHY, | |
| Defendants, | |
| and, | |
| REVOLUTION LIGHTING TECHNOLOGIES, INC., | |
| Nominal Defendant. | |

Plaintiffs Russell Hopewell and Craig Holman ("Plaintiffs"), by and through their undersigned counsel, derivatively on behalf of Nominal Defendant Revolution Lighting Technologies, Inc. ("Revolution" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by Revolution Lighting with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Revolution Lighting against its directors seeking to remedy the Director Defendants' (defined herein) breach of fiduciary duties, corporate waste, gross mismanagement, and violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 that occurred from March 14, 2014 to the present (the "Relevant Period"), and which has caused substantial harm to Revolution Lighting.

2.      On October 17, 2018, Revolution Lighting reported preliminary financial results for third quarter 2018, with revenue expected to be $33 million, compared to guidance of $40- $41 million. Revolution Lighting also announced that Defendant Robert V. LaPenta ("LaPenta"), its Chief Executive Officer ("CEO"), had offered to acquire all of the common stock of the Company for a price of $2.00 per share.

3.      On this news, the Company's stock price fell $0.98 per share, or over 38%, to close at $1.58 per share on October 17, 2018, on unusually heavy trading volume.

4.      On October 19, 2018, the Company disclosed "an ongoing investigation by the SEC regarding certain revenue recognition practices, including bill and hold transactions that occurred between 2014 through the second quarter of 2018."

5.      On this news, the Company's stock price fell $0.16 per share, or over 10%, to close at $1.43 per share on October 22, 2018, on unusually heavy trading volume.

6.      On November 14, 2018, the Company announced that its Transaction Committee was considering an updated proposal from LaPenta to acquire all of the Company's outstanding stock for $1.50 per share, referring in part to the SEC investigation as part of the reason LaPenta wished to take Revolution Lighting private.

7.      On this news, the Company's stock price fell $0.55 per share, or nearly 40%, to

close at $0.85 per share on November 15, 2018, on unusually heavy trading volume.

8.     Throughout the Relevant Period, the Company made false and/or misleading statements, as well as failed to disclose material adverse facts about its business, operations, and prospects. Specifically, the Company made false and/or misleading statements and/or failed to disclose that: (i) the Company was improperly recognizing revenue for certain transactions; (ii) as a result, the Company's financial statements were misstated; (iii) the Company lacked adequate internal controls over financial reporting; (iv) as a result, the Company would be subject to regulatory scrutiny and incur substantial costs; and (v) as a result of the foregoing, the Company's positive statements about its business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

9.     Pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) of the Exchange Act.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

10.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.    Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) Revolution Lighting maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial

portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Revolution Lighting, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiffs**

12.   ***Plaintiff Russell Hopewell*** ("Plaintiff Hopewell") is, and was at relevant times, a shareholder of Revolution Lighting.  Plaintiff Hopewell will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

13.   ***Plaintiff Craig Holman*** ("Plaintiff Holman") is, and was at relevant times, a shareholder of Revolution Lighting.  Plaintiff Holman will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

14.   ***Nominal Defendant Revolution Lighting*** is incorporated under the laws of Delaware with its principal executive offices located in Stamford, Connecticut.

**Director Defendants**

15.   ***Defendant Robert V. LaPenta*** ("LaPenta") is the CEO and Chairman of the Board of Directors (the "Board") of the Company at all relevant times.

16.   ***Defendant James A. DePalma*** ("DePalma") has served as a member of the Board since September 2012 and as Chief Financial Officer ("CFO") since July 2015.

17.   ***Defendant William D. Ingram*** ("Ingram") has served as a member of the Board since September 2012.  Defendant Ingram is a member of the Audit Committee and the Chair of

the Compensation Committee. Defendant Ingram is also a member of the Governance and Nominating Committee.

18.     **_Defendant Stephen G. Virtue_** ("Virtue") has served as a member of the Board since September 2012. Defendant Virtue is a member of the Audit Committee and the Compensation Committee. Defendant Virtue is also the Chair of the Governance and Nominating Committee.

19.     **_Defendant Dennis McCarthy_** ("McCarthy') has served as a member of the Board since September 2012. Defendant McCarthy is the Chair of the Audit Committee and a member of the Compensation Committee. Defendant McCarthy is also a member of Governance and Nominating Committee.

20.     Defendants LaPenta, DePalma, Ingram, Virtue and McCarthy are herein collectively referred to as the "Director Defendants."

## REVOLUTION LIGHTING'S CORPORATE GOVERNANCE

21.     As members of Revolution Lighting's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

22.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Revolution Lighting, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

## AUDIT COMMITTEE CHARTER

23.     The Company's Audit Committee Charter states in relevant part:

The Audit Committee (the "Committee") shall assist the Board in fulfilling its responsibility to oversee management regarding: (i) the conduct of, and the integrity of, the Company's financial reporting to any governmental or regulatory body, shareholders, other users of Company financial reports and the public; (ii)

the Company's systems of internal control over financial reporting and disclosure controls and procedures; (iii) the Company's legal and regulatory compliance; (iv) the application of the Company-s related-person transaction policy as established by the Board; and (v) the application of the Company's codes of business conduct and ethics as established by management and the Board. In addition, the Committee shall oversee the qualifications, engagement, compensation, independence and performance of the registered public accounting firm that shall audit the annual financial statements of the Company (the "independent auditor") and any other registered public accounting firm engaged to prepare or issue an audit report or to perform other audit, review or attest services for the Company. All references in this charter to the Company are intended to refer also to any subsidiary of the Company and any "variable interest entity" whose results of operations are consolidated with those of the Company, except where the context otherwise requires.

In discharging its role, the Committee is empowered to inquire into any matter it considers appropriate to carry out its responsibilities, with access to all books, records, facilities and personnel of the Company, and, subject to the direction of the Board, the Committee is authorized and delegated the authority to act on behalf of the Board with respect to any matter necessary or appropriate to the accomplishment of its purposes. In addition to retaining on behalf of the Company the Company's independent auditor and any other accounting firm the retention of which to prepare or issue any other audit report or to perform any other audit, review, or attest services the Committee determines is necessary or appropriate in connection with the conduct of the Company's business and affairs, the Committee is empowered to retain legal counsel and accounting and other advisors and consultants to assist it in carrying out its activities. The Committee shall have the sole authority to direct and oversee the activities of, and to terminate the engagement of, the Company's independent auditor and any other accounting firm retained by the Committee to prepare or issue any other audit report or to perform any other audit, review or attest services and any legal counsel, accounting or other advisor or consultant hired to assist the Committee, all of whom shall be accountable to the Committee. The Company shall provide adequate resources to support the Committee's activities, including compensation of the Company's independent auditor and any other auditor and any legal counsel, accounting or other advisor or consultant retained by the Committee.

*   *   *

**COMMITTEE MEMBERSHIP**

The Committee shall consist of three or more members of the Board. Each member of the Committee shall meet the independence and experience requirements of the applicable listing standards of The NASDAQ Stock Market and the Securities Exchange Act of 1934, as amended (the "Exchange Act"). All members of the Committee shall meet the financial literacy requirements of The NASDAQ Stock

Market and at least one member shall be an "audit committee financial expert" as such term is defined under applicable rules promulgated by the Securities and Exchange Commission (the "SEC").

A director selected as a Committee member shall continue to be a member for as long as he or she remains a director or until his or her earlier resignation from the Committee. Any member may be removed from the Committee by the Board, with or without cause, at any time. The Chair of the Committee shall be appointed from among the Committee members by, and serve at the pleasure of, the Board, shall preside at meetings of the Committee and shall have authority to convene meetings, set agendas for meetings, and determine the Committee's information needs, except as otherwise provided by action of the Committee. In the absence of the Chair at a duly convened meeting, the Committee shall select a temporary substitute from among its members to serve as chair of the meeting.

\*      \*      \*

**RESPONSIBILITIES**

The Committee's role is one of oversight. The Company's management is responsible for preparing the Company's financial statements and the independent auditor is responsible for auditing the annual financial statements. Consequently, in carrying out its oversight responsibilities, the Committee is not providing any expert or special assurance as to the Company's financial statements or any certification as to the work of any auditor.

The following duties, responsibilities and functions are set forth as a guide to fulfilling the Committee's purposes, with the understanding that the Committee may undertake other and different activities, and that the Committee's activities may diverge from those described below, as appropriate under the circumstances.

In such manner as the Committee determines is appropriate to fulfill its purposes, the Committee shall:

\*      \*      \*

**Oversee Internal Controls and Risk Management**

review and advise the chief executive officer and the Board with respect to the appointment, dismissal and replacement of the chief financial officer and chief accounting officer and consult with the chief executive officer and the Compensation Committee about the performance evaluation and compensation of each;

establish and oversee the effectiveness of procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or

auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting, financial reporting or auditing matters;

oversee management's design and maintenance of the Company's internal control over financial reporting and disclosure controls and procedures, including reviewing and discussing with management and the independent auditor (i) management's certification in the Company's periodic SEC reports concerning the Company's disclosure controls and procedures and any reports by management or the independent auditor of a material weakness or significant deficiency in internal control over financial reporting, (ii) the actions taken to remedy any such material weakness or significant deficiency and any changes in circumstances that have, or are reasonably likely to have, a material effect on internal control over financial reporting, (iii) management's annual assessment of the adequacy of the Company's internal control over financial reporting, (iv) if and when applicable, the independent auditor's annual attestation report regarding the Company's internal control over financial reporting prior to the filing of the Company's Annual Report on Form 10-K, and (v) any identified act of fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting or disclosure controls and procedures;

review and discuss with management and the independent auditor the Company's financial risk exposures and assess the policies and processes management has implemented to monitor and control such exposures, (ii) assist the Board in fulfilling its oversight responsibilities regarding the Company's policies and processes with respect to risk assessment and risk management, including any significant non-financial risk exposures, and

review the Company's annual disclosures concerning the role of the Board in the risk oversight of the Company, such as how the Board administers its oversight function;

**Oversee Financial Reporting and Auditing**

review and discuss with management and the independent auditor: (i) the critical accounting policies and practices used by the Company, the accounting treatment to be applied in respect of significant new transactions or other significant events not in the ordinary course of the Company's business and any significant changes in management's selection or application of accounting principles; (ii) alternative accounting treatments within generally accepted accounting principles ("GAAP") for material items that have been discussed by the independent auditor with management, including the ramifications of the use of such treatments and the treatment preferred by the independent auditor, and other material written communications between the independent auditor and management such as a schedule of unadjusted differences; (iii) other material written communications

between the independent auditor and management, such as any management letter or schedule of unadjusted differences; and (iv) the effect of regulatory and accounting initiatives on the Company's financial statements; review and, as pertinent, discuss with management and the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 114 relating to the conduct of the audit, including: (i) any significant difficulties encountered in the course of audit work, including any restrictions on the scope of audit activities or on access to requested information; (ii) any special audit steps adopted by the independent auditor in light of any material weakness in the Company's internal control over financial reporting; (iii) any material changes required in the scope of the audit plan; (iv) any significant disagreements with management and (v) periodically, the status of the Company's response to previous audit recommendations;

oversee the Company's financial reports, including: (i) resolve any disagreements regarding financial reporting between management and the independent auditor; (ii) review any significant findings by the independent auditor relating to the preparation of the Company's financial statements; (iii) review and discuss with management and the independent auditor, prior to public release, the Company's annual and quarterly financial statements to be filed with the SEC including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations"; (iv) prior to release of the annual audited financial statements, meet with the independent auditor without any management member present to discuss the independent auditor's views about the qualitative aspects of the Company's significant accounting practices; (v) recommend to the Board whether to include the audited annual financial statements in the Company's Annual Report on Form 10-K to be filed with the SEC; and (vi) prior to submission to any governmental authority of (a) any financial statement of the Company that differs from the financial statements filed or to be filed by the Company with the SEC or (b) any financial statement of a subsidiary of the Company that in the Committee's judgment is material to the Company and that presents information regarding such subsidiary in a way that is materially different from the presentation of such information in the financial statements of the Company filed or to be filed with the SEC review such financial statements and any report, certification or opinion thereon provided by an independent auditor;

review and discuss with management and the independent auditor any material off-balance sheet financing and any other material financial arrangement that does not appear in the financial statements of the Company;

discuss with management the Company's earnings press releases and review financial information and earnings guidance provided to analysts and to rating agencies, including any such dissemination of financial information not involving the presentation of financial measures in accordance with GAAP […].

## DUTIES OF DEFENDANTS

24.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Revolution Lighting, the Director Defendants owed Revolution Lighting and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage Revolution Lighting in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of Revolution Lighting and its investors.

25.     Each director of the Company owes to Revolution Lighting and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

26.     To discharge their duties, the officers and directors of Revolution Lighting were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Revolution Lighting were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how Revolution Lighting conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

27.     Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their

obligations as directors and officers of Revolution Lighting, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

28.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, Revolution Lighting has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## SUBSTANTIVE ALLEGATIONS

### Background

29.     The Company purports to design and manufacture LED lighting solutions for industrial, commercial, and government markets.

30.     In August 2013, the Company acquired Relume Technologies ("Relume"), a manufacturer of LED lighting products and control systems.

31.     In April 2014, the Company acquired Value Lighting Inc. ("Value Lighting"), a supplier of lighting solutions to the multifamily residential market.

### FALSE AND MISLEADING
### STATEMENTS MADE DURING THE RELEVANT PERIOD

32.     On March 14, 2014, the Company filed its annual report on Form 10-K for the period ended December 31, 2013 (the "2013 Form 10-K"). It reported revenue of $26.06 million. Regarding the Company's revenue recognition policy, the 2013 Form 10-K stated in relevant part:

> We recognize revenue for our products upon shipment or delivery to customers in accordance with the respective contractual arrangements, provided no significant obligations remain and collection is probable. For sales that include customer acceptance terms, revenue is recorded after customer acceptance. It is our policy that all sales are final.  Requests for returns are reviewed on a case by case basis. As revenue is recorded, we accrue an estimated amount for product returns as a reduction of revenue.

Revenues from merchandise shipped to a logistics supplier for Seesmart, who had the contractual right to return merchandise in inventory, was recognized when the merchandise was delivered by the logistics supplier to the end user. Payments received from the logistics supplier prior to recognizing the related revenue are recorded as customer deposits. During the first quarter of 2013, this arrangement was terminated.

Pursuant to agreements with distributors, which provide the distributors with the rights to purchase and resell inventory, we receive up front licensing fees for ongoing support obligations during the term of the agreement. Such fees are amortized by us over the term of the contracts which range from three to ten years. Unamortized licensing fees are included in deferred revenue in the accompanying consolidated balance sheets. Sales taxes billed to customers are recorded on a gross basis as revenues. From time to time, we enter into multiple element arrangements to provide products and installation services. Revenues are allocated to each element based on our best estimate of the selling prices of each element.

33.     The 2013 Form 10-K contained certifications by Defendants LaPenta and Schafer to attest that the financial information contained therein was accurate and that it disclosed any material changes to Revolution Lighting's internal controls over financial reporting.

34.     However, the 2013 10-K disclaimed any assessment of the internal controls with respect to Relume. Revolution Lighting stated, in relevant part:

In conducting the Company's evaluation of the effectiveness of its internal control over financial reporting, management determined that the internal control systems of Relume Technologies, Inc. and Tri-State DE LLC, wholly owned subsidiaries acquired on August 22, 2013 and November 15, 2013, respectively, would be excluded from its internal control assessment, as permitted by guidance issued by the Securities and Exchange Commission. Accordingly, as of and for the year ended December 31, 2013, internal control systems underlying to approximately 24% of consolidated revenues and 14% of consolidated assets have been excluded from management's evaluation of internal control over financial reporting.

35.     On May 12, 2014, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2014 (the "1Q14 10-Q") and reported revenue of $4.95 million.

36.     The 1Q14 10-Q contained a certification by Defendant LaPenta to attest that the financial information contained therein was accurate and that it disclosed any material changes to

the Company's internal controls over financial reporting.  Further, the report stated that "[t]here was no change in [the Company's] internal controls over financial reporting that occurred during the quarter ended March 31, 2014 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

37.    On August 7, 2014, the Company filed its quarterly report on Form 10-Q for the period ended June 30, 2014 (the "2Q14 Form 10-Q") and reported revenue of $17.52 million.

38.    The 2Q14 Form 10-Q contained a certification by Defendants LaPenta to attest that the financial information contained therein was accurate and that it disclosed any material changes to the Company's internal controls over financial reporting.  Under the heading "Controls and Procedures," the report stated in relevant part:

> During the second quarter of 2014, the Company implemented new accounting systems and related modifications of processes and controls at its Relume and Lumificient subsidiaries. The Company also hired Directors of Finance at its Relume, Seesmart and newly acquired Value Lighting subsidiaries and expanded its accounting resources at its corporate headquarters and Value Lighting subsidiaries.

39.    On November 6, 2014, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2014 (the "3Q14 Form 10-Q") and reported revenue of $26.88 million.

40.    The 3Q14 Form 10-Q contained certifications by Defendants LaPenta and Schafer to attest that the financial information contained therein was accurate and that it disclosed any material changes to the Company's internal controls over financial reporting.  Further, the report stated that "[t]here was no change in [the Company's] internal controls over financial reporting that occurred during the quarter ended September 30, 2014 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

41.    On March 16, 2015, the Company filed its annual report on Form 10-K for the period ended December 31, 2014 (the "2014 Form 10-K").  For 2014, the Company reported

revenue of $76.85 million.

42.     The 2014 Form 10-K contained certifications by Defendants LaPenta and Schafer to attest that the financial information contained therein was accurate and that it disclosed any material changes to the Company's internal controls over financial reporting.

43.     However, the 2014 Form 10-K disclaimed any assessment of the internal controls with respect to Value Lighting.   The Company stated, in relevant part:

> In conducting the Company's evaluation of the effectiveness of its internal control over financial reporting, management determined that the internal control systems of Value Lighting and All Around, wholly-owned subsidiaries acquired on April 17, 2014 and December 18, 2014, respectively, would be excluded from its internal control assessment, as permitted by guidance issued by the Securities and Exchange Commission.   Accordingly, as of and for the year ended December 31, 2014, internal control systems underlying to approximately 60% of consolidated revenues and 24% of consolidated assets (excluding goodwill and identifiable intangible assets), have been excluded from management's evaluation of internal control over financial reporting.

44.     On November 5, 2015, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2015 (the "3Q15 Form 10-Q").   This report contained certifications by Defendants LaPenta and DePalma to attest that the financial information contained therein was accurate and that it disclosed any material changes to the Company's internal controls over financial reporting.

45.     The 3Q15 Form 10-Q reported revenue of $37.73 million for the quarter.   It also disclosed a different revenue recognition policy than in prior periods.   The Company stated in relevant part:

> The Company recognizes revenue for its products upon shipment or delivery to customers in accordance with the respective contractual arrangements, provided no significant obligations remain and collection is probable.   For sales that include customer acceptance terms, revenue is recorded after customer acceptance. It is the Company's policy that all sales are final. Requests for returns are reviewed on a case-by case basis. As revenue is recorded, the Company accrues an estimated amount for product returns as a reduction of revenue.

The Company recognizes revenue from fixed-price and modified fixed-price contracts for turnkey energy conservation projects using the percentage-of-completion method of accounting. The percentage-of-completion is computed by dividing the actual incurred cost to date by the most recent estimated total cost to complete the project. The computed percentage is applied to the expected revenue for the project to calculate the contract revenue to be recognized in the current period. This method is used because management considers total cost to be the best available measure of progress on these contracts. Contract costs include all direct material and labor costs and indirect costs related to contract performance. Provisions for estimated losses on uncompleted contracts are made in the period in which such losses are determined.

46.    On March 10, 2016, the Company filed its annual report on Form 10-K for the period ended December 31, 2015 and reported revenue of $129.66 million. This report contained certifications by Defendants LaPenta and DePalma to attest that the financial information contained therein was accurate and that it disclosed any material changes to the Company's internal controls over financial reporting.

47.    On March 9, 2017, the Company filed its annual report on Form 10-K for the period ended December 31, 2016 and reported revenue of $172.12 million. This report contained certifications by Defendants LaPenta and DePalma to attest that the financial information contained therein was accurate and that it disclosed any material changes to the Company's internal controls over financial reporting.

48.    On March 8, 2018, the Company filed its annual report on Form 10-K for the period ended December 31, 2017 and reported revenue of $152.31 million. This report contained certifications by Defendants LaPenta and DePalma to attest that the financial information contained therein was accurate and that it disclosed any material changes to Revolution Lighting's internal controls over financial reporting. Moreover, the report stated that "management concluded that [the Company's] disclosure controls and procedures were effective at a reasonable assurance level as of the end of the period covered by the report."

49.     On May 1, 2018, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2018 and reported revenue of $33.74 million.  This report contained certifications by Defendants LaPenta and DePalma to attest that the financial information contained therein was accurate and that it disclosed any material changes to the Company's internal controls over financial reporting.  Moreover, the report stated in relevant part:

> [M]anagement concluded that [the Company's] disclosure controls and procedures were effective at a reasonable assurance level as of the end of the period covered by the report.

> *     *     *

> Beginning January 1, 2018, we implemented ASC 606, "Revenue from Contracts with Customers." Although the new revenue standard had an immaterial impact on our ongoing net income, we did implement changes to our processes related to revenue recognition and the control activities within them. These included the development of new policies based on the five-step model provided in the new revenue standard, new training, ongoing contract review requirements, and gathering of information provided for disclosures.

50.     On August 13, 2018, the Company filed its quarterly report on Form 10-Q for the period ended June 30, 2018 (the "2Q18 Form 10-Q") and reported revenue of $36.44 million.

51.     The 2Q18 Form 10-Q reported a material weakness in the Company's financial reporting.  Under the heading "Controls and Procedures," the Company stated, in relevant part:

> As of December 31, 2017, our management conducted an evaluation of our internal control over financial reporting and determined that our internal control over financial reporting was effective.  At such date we identified a significant deficiency related to the controls over the proper identification of certain collection patterns relevant for bill and hold revenue recognition.  Since December 31, 2017, our management has implemented changes in internal control over financial reporting to address this significant deficiency, including changing the design of existing controls and implementing additional transaction level and review controls.  In addition, corporate management is strengthening the internal accounting functions at the divisional or subsidiary level, where appropriate.

> At June 30, 2018, we have determined that certain of the transaction level and review controls over revenue recognition have not operated effectively. Specifically, our management has identified control deficiencies related to the

proper identification of certain collection patterns and the finalization and review of executed contracts related to bill and hold arrangements and controls over the recording of material costs.  We have determined that these control deficiencies aggregate to a material weakness at June 30, 2018.

52.     The above statements identified above were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company was improperly recognizing revenue for certain transactions; (ii) as a result, the Company's financial statements were misstated; (iii) the Company lacked adequate internal controls over financial reporting; (iv) as a result, the Company would be subject to regulatory scrutiny and incur substantial costs; and (v) as a result of the foregoing, the Company's positive statements about its business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### THE TRUTH BEGINS TO EMERGE

53.     On October 17, 2018, the Company reported preliminary financial results for third quarter 2018 with revenue expected to be $33 million, compared to previously announced guidance of $40-$41 million.  The Company also announced that its CEO had offered to acquire all of the common stock of the Company for a price of $2.00 per share.  In a press release entitled *Revolution Lighting Technologies (RVLT) Provides Preliminary Third Quarter Update and Revises Full Year Guidance*, the Company stated in relevant part:

> While the company has been successful in winning a number of important projects, it continues to experience delays in starting and or shipping against these projects particularly at our multifamily and Tri-State divisions. As a result, we expect revenue of approximately $33 million for the third quarter versus prior third quarter guidance of $40-$41 million.  Due to the decline in expected third quarter revenue and our current outlook for the fourth quarter, total revenue for the full year 2018 is expected to approximate $140-$145 million versus our previous full year guidance of $160-$170 million.

We are disappointed in our results and recognize that we need to address our overall business structure, reduce operating costs to a level more aligned with our revenue expectations and address our level of outstanding debt. Over the past six months, our CEO and Chairman, Robert LaPenta, has provided approximately $15 million of capital to fund operations, bringing our total debt, including bank financing, to over $60 million. Mr. LaPenta believes additional capital requirements cannot presently be addressed through third party financing.

Mr. LaPenta has proposed to acquire all of the common stock of the Company that he and his affiliates do not currently own. The text of Mr. LaPenta's letter to the Company's independent directors appears in full below:

We write to you in connection with your roles as independent, disinterested members of the Board of Directors . . .

\* \* \*

Without additional funding, we believe that the Company may be forced to consider various restructuring alternatives in the near term.

Simply put, we do not believe that it is in the best interests of the Company and its stockholders to continue as a publicly traded enterprise, as we believe it currently lacks sufficient scale and the ongoing costs of maintaining the reporting and related infrastructure necessary for public reporting are a significant financial burden on the Company. In addition, we believe the constant pressure to meet quarterly earnings targets has been a significant distraction to the Company's management and has prevented management from appropriately focusing on the long-term growth and the development of the Company's business.

As a result of the above factors, we propose to acquire all of the common stock of the Company that we do not currently own for a price of $2.00 per share. Given our familiarity with the Company, we would not need to conduct any further due diligence on the Company and would be in a position to sign a definitive transaction agreement quickly.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

54.     Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Director Defendants.

55.     Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and have retained counsel competent and

experienced in derivative litigation.

56.     Plaintiffs are current owners of Revolution Lighting.  Plaintiffs understand their obligation to hold stock throughout the duration of this action and are prepared to do so.

57.     During the wrongful course of conduct at the Company, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

58.     The Revolution Lighting Board is currently comprised of four (5) members: Defendants LaPenta, DePalma, Ingram, Virtue and McCarthy.  Thus, Plaintiffs are required to show that a majority of the Director Defendants, *i.e.*, three (3), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

59.     The Director Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning the aforesaid matters.  Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Director Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

60.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

61.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously

prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

62.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

63.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

64.     Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, the Director Defendants are unable to comply with their fiduciary duties and prosecute this action.  Each of them is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending themselves in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

65.     Additionally, and on information and belief, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant LaPenta**

66.     Defendant LaPenta is the CEO of the Company and is also the Chairman of the

21

Board of the Company.  Defendant LaPenta is not disinterested or independent, and therefore, is incapable of considering demand because he (as CEO) is an employee of the Company who derived substantially all his income from his employment with the Company, making him not independent.  As such, LaPenta cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

67.     This lack of independence and financial benefits received by Defendant LaPenta renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

68.     Defendant LaPenta is also a defendant in the securities class actions entitled: (1) *Glavan v. Revolution Lighting Technologies, Inc., et. al.*, Case 1:19-cv-00980 (S.D.N.Y.); (2) *Hubner v. Revolution Lighting Technologies, Inc., et. al.*, Case 1:19-cv-02308 (S.D.N.Y.); and (3) *Bishop v. Revolution Lighting Technologies, Inc. et. al.*, Case 1:19-cv-2722 (S.D.N.Y.) (collectively, the "Securities Class Actions").  As such, Defendant LaPenta cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability in the Securities Class Actions.

**Defendants Ingram, Virtue and McCarthy**

69.     The Company's Audit and Finance Committee is presently comprised of Defendants Ingram, Virtue and McCarthy.

70.     Defendants  Ingram, Virtue and McCarthy breached their fiduciary duties of due care, loyalty, and good faith, because as members of the Audit Committee, *inter alia*, they allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place

regarding the deficiencies described above.

**Defendant DePalma**

71.     Defendant DePalma is a defendant in the Securities Class Actions.  As such, Defendant DePalma cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability in the Securities Class Actions.

## FIRST CAUSE OF ACTION

### Against the Director Defendants for Breach of Fiduciary Duties

72.     Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

73.     The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

74.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

75.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties and thus breached their fiduciary duties owed to Revolution Lighting.

76.     The Director Defendants had actual or constructive knowledge of the above misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

77.     As a direct and proximate result of the Director Defendants' failure to perform their

fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

78.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

### SECOND CAUSE OF ACTION

### Against the Director Defendants for Waste of Corporate Assets

79.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein

80.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

81.     As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

82.     As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

83.     Plaintiffs, on behalf of Revolution Lighting, have no adequate remedy at law.

### THIRD CAUSE OF ACTION

**Against the Director Defendants for Gross Mismanagement**

84.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

85.     By their actions alleged herein, the Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

86.     As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

87.     Because of the misconduct and breaches of duty alleged herein, the Director Defendants are liable to the Company.

## FOURTH CAUSE OF ACTION

**Against Defendants for Violations of Section 10(b)
of the Exchange Act and SEC Rule 10b-5**

88.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

89.     During the relevant period, Defendants disseminated or approved public statements that failed to disclose the truth about the Company's business and corporate affairs as set forth above, and thus Revolution Lighting's public statements were materially false and/or misleading at all relevant times.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

90.     As such, Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud; and

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

91.     As a result of Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.     Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: May 1, 2019

GAINEY McKENNA & EGLESTON

By: */s/ Thomas J. McKenna*
     Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiffs*

## <u>VERIFICATION</u>

I, RUSSELL HOPEWELL, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this ___30___ day of April 2019.

_____  4/30/2019
RUSSELL HOPEWELL

## VERIFICATION

I, CRAIG HOLMAN, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _22_ day of April 2019.

CRAIG HOLMAN